Mr. and Mrs. Belouguet *v.* Dominique Lanata.

The general rule being that dotal property is insusceptible of hypothecation, it should appear manifestly from the terms of the marriage contract, that the right claimed for its exercise in a particular case was expressly reserved.

When the marriage contract contained the following clause: "Les immeubles dotaux pourront être aliénés par le futur époux, avec le consentement de la future épouse, pendant le mariage à la condition expresse, que remploi de leur valeur sera fait en d'autres immeubles." *Held:* That under such a reservation the power did not exist to mortgage the dotal property of the wife for money borrowed to pay off a mortgage in favor of the Citizens' Bank, which was binding on the property of the wife thus mortgaged.

APPEAL from the Second District Court of New Orleans, *Morgan,* J.
*A. Legardeur,* for plaintiff. *C. Roselius* and *C. Dufour,* for defendant and appellant.

Spofford, J. In January, 1854, *Mrs. Belouguet,* assisted by her husband, mortgaged some of her dotal property, to secure the sum of $11,533 36 ad-

vanced upon her promissory notes; the act of mortgage stated that this sum was "advanced in order to enable her to pay certain mortgage debts due the Citizens' Bank of Louisiana, to *J. A. Durel*, as also certain other debts contracted by her for her use and benefit."

She and her husband afterwards brought this suit against the holder of the notes and mortgage, to have the mortgage declared null and void; first, because the money thus lent, did not enure to her benefit; and, second, because the property mortgaged being dotal property, she had no right, power or capacity to mortgage the same.

She had judgment in her favor and the defendant has appealed.

We think it sufficiently established by affirmative proof, that the portion of the money loaned, which went to pay the debt of $3,611 20, due to the Citizens' Bank, enured to her benefit. It becomes necessary, therefore, to inquire whether the mortgage of the dotal property in favor of the defendant was valid in law under the circumstances in evidence before us.

The general rule as laid down in Article 2337 of the Code, is that "immovables, settled as dowry, can be sold or mortgaged (*aliénés ou hypothéqués*) during the marriage, neither by the husband nor the wife, nor by both together, except as is hereinafter expressed."

The only exception to this rule applicable to the present case, is that contained in Article 2340: "immovables settled as dowry, may be alienated with the wife's consent, when the alienation of the same has been allowed by the marriage contract; but their value must be reinvested in other immovables."

The marriage contract by which the mortgaged property was constituted as dowry, contained the following Article, from which the appellant infers that his mortgage is a valid one:

"Art. 3me. Les immeubles dotaux pourront être aliénés par le futur époux, avec le consentement de la future épouse, pendant le marriage à la condition expresse, que remploi de leur valeur sera fait en d'autres immeubles."

A power to alienate may, under some circumstances, include a power to hypothecate. And the right of the spouses to stipulate in their marriage contract that the dotal property shall be subject to hypothecation, may also be conceded.

But the question here is, not what might the parties have done, but what have they done; not what the Code means, but what the marriage contract means.

The general rule being, that dotal property is insusceptible of hypothecation,* it should appear manifestly, from the terms of the marriage contract, that the right to mortgage it, in such a case as the present, was reserved.

But that contract only reserved to the husband, acting with his wife's consent, the power to alienate her dotal immovables upon the express condition of reinvesting their value in other immovables.

Here the wife, acting with the husband's consent, has assumed the power of mortgaging her dotal property for the avowed purpose of raising money to pay off her old debts.

We think it impossible, under any just rule of interpretation to say, that

---

* NOTE—*i. e.* Prior to the dissolution of the marriage, *or* a judgment involving a separation of property. See *Guérin* v. *Rivarde*, 8 Rob. 457. H. M. S.

by the qualified power of alienation conceded to the husband, this absolute power of hypothecation was reserved to the wife.

By the Act of mortgage itself, the mortgagee was notified of the destination of the money he loaned to a married woman. He was bound to know the character of the property mortgaged, and to inquire into the authority of the mortgagor to incumber it for the purposes specified in the act.

In this court, the appellant has made the point that the wife could not institute an action like the present, until after a dissolution of the marriage or a separation of property, and the Article 2342 of the Civil Code is cited as sustaining the position.

If she were incompetent to sue, upon which we express no opinion, the husband was competent, and he appears as a distinct party plaintiff. C. C. 2330 ; see also C. P. 107.

The appellant has apparent reason to complain of the hardship of the case, so far at least as relates to that portion of the loan which went to extinguish a valid mortgage upon *Mrs. Belouguet's* property in favor of the Citizens' Bank. But he might have taken a subrogation to the mortgage rights of the bank and did not. We cannot cure the effects of this *laches ;* nor can the hardship of a case, nor even the imputed bad faith of a person laboring under a legal incapacity have the effect to give vitality to an act void in law. If the mere imputation of bad faith against a woman under marital authority, would deprive her of the laws made for her protection, they should be expunged from the statute book. For good faith requires her to do whatever she voluntarily engages to do.

· It is true, the case affords a fresh illustration of the necessity for constant vigilance which our laws impose upon all persons who deal with married women and minors, or in any way touch their property. But the laws and jurisprudence of Louisiana in this regard, are fixed and clear.

And it may be proper to remark that, in the interpretation and application of local laws, it is the local jurisprudence alone which carries with it a controlling weight of authority.

If the Supreme Court of the United States, for which, in its constitutional sphere, we profess the utmost loyalty and respect, has ever overlooked this wholesome rule, whilst construing the peculiar laws of Louisiana, it must have overlooked, at the same time, one of its oldest traditions, and set an example which we cannot follow.

Judgment affirmed.

MERRICK, C. J. It must be conceded that the decree prepared by a majority of the court, works a very great hardship to the defendant.

The debt due by the plaintiff to the Citizens' Bank, and paid by the defendant, was equivalent to a debt of a certain date prior to the marriage contract. C. C. 2341. Her property was so bound by her mortgage to the bank, that a sale of the property by a syndic or administrator to pay debts, would not extinguish it. The money borrowed upon the mortgage given to the defendant, paid this mortgage. The plaintiff having released her property from the mortgage to the Citizens' Bank, by hypothecating it to the defendant, now comes into a court of justice, and asks it to relieve her of the last mortgage, and permit her to enjoy in peace the property which the defendants money has redeemed.

I doubt much whether I am obliged by the Code, or any principle of our law, to assent to what appears to me to be so unjust.

I think the weight of authority is decidedly in favor of the position, that the power to alienate, used in a marriage contract, includes also that of mortgaging. See authorities collected in Throp. Du Marriage, No. 3363. We held last year, in the case of the *Citizens' Bank v. Armor*, 11 An. 468, that a mortgage was a *quasi* alienation. Indeed I do not understand the opinion just pronounced to controvert this doctrine, but it rests the decree upon the ground that the mortgagee was bound to see the money lent invested in other immovables as specified in the marriage contract, which the majority of the court conclude he failed to do.

Let us consider what was the object of this stipulation in the marriage contract; certainly it was nothing more than to prevent the dotal funds of the wife from being invested in anything else than dotal property. If that object is fully accomplished, neither the wife nor her husband have any reason to complain.

When this property was mortgaged to the Citizens' Bank, there had been a partial dismemberment of property, and by the *quasi* alienation created by the mortgage, the Citizens' Bank had acquired a right in the property, and as a consequence, the wife had lost a portion of her *dominium* over it, for she had no longer the full right to dispose of the property as she pleased. Trop. Hyp. No. 386; C. C. 3245, 2007; C. P. 42 and 61. What of property or ownership she had lost, the Citizens' Bank had acquired. Now, as a consequence, at the time the defendant lent the money to pay the debt, the plaintiff was not the absolute owner of the property. The defendant saw the money applied to the payment of the debt of the Citizens' Bank, by means of which the right of that bank to the property was extinguished, and the right which the bank had held, reinvested in the plaintiff. There had then been a substantial reinvesting of her dotal funds, obtained on the mortgage to defendant, to the extent of the debt of the Citizens' Bank. It is true it was not invested in *another* immovable, but it was invested in another real action, constituting a part of the *dominium* in the immovable. C. P. 61. Why, therefore, is it not as much within the spirit of the marriage contract, as would be the case if the wife had been the owner of the property constituted in dower to the extent, say, of seven-eighths, and had mortgaged the seven-eighths in order to invest the proceeds in the purchase of the outstanding one-eighth? Or, being the owner of the naked property, had mortgaged it to buy in the usufruct? This would not literally be a reinvestment in *another* immovable, but it seems to me, would be a substantial compliance with the contract, and I am inclined to think that there was the like compliance in the acquisition to the plaintiff of the mortgage of the Citizens' Bank.

It may moreover be remarked, that the debt of the Citizens' Bank authorized that institution to seize and sell the property mortgaged in the hands of the plaintiff. By Article 2341 of the Civil Code, that debt being equivalent to a debt of a certain date anterior to the marriage, it was in the power of the Judge to authorize the sale not only of the property mortgaged, but any other dotal property for the payment of the debt. The debt to the Citizens' Bank being, therefore, so absolute, it is against natural equity that these parties should be permitted to enrich themselves by its extinguishment at the expense

of the defendant, and thus derive their means of living, during the marriage, from a house which the defendant's money has partially paid for, and which is thus protected from the pursuit of the creditors of these parties.

Holding these views, I am not prepared to assent to the decree in this case, so far as the same declares the mortgage null, for the money which was used in the payment of the debt of the Citizens' Bank.

BUCHANAN, J. dissenting. The object of this action is to annul a mortgage given by a married woman, and a Sheriff's sale of the mortgaged property.

The mortgage has been foreclosed by legal process, after notice of the debtor and strict compliance with all the forms of law. It is not alleged, that the defendant was guilty of fraud or ill practice in these proceedings, nor that they were in any respect irregular.

But the plaintiff, *Mrs Belouguet*, rests her action upon the following grounds :

1st. That no part of the money for the loan of which the mortgage was given ever enured to the benefit of the mortgagor.

2d. That the property mortgaged, being dotal, was not susceptible of mort-gage.

The mortgage recites, that the loan is made to *Mrs. Belouguet*, "*in order to enable her to pay certain mortgage debts, due to the Citizens' Bank and to J. A. Durel, as also certain other debts contracted by her for her own use and benefit.*" A mortgage certificate of even date with, and recited at full length in the mortgage, shows the property to be encumbered with a mortgage in favor of *J. A. Durel*, to secure the payment of a note of twenty-five hundred dollars, maturing the very day of the mortgage now under consideration, (January, 4th, 1854,) "*which note,*" says the act, "*was paid this day by said Faurés unto said Durel, as the said Mrs. Belouguet hereby acknowledges.*" The contradiction between these solemn declarations of *Mrs. Belouguet*, when borrowing defendant's money, and the equally solemn declarations of her petition in this action to defeat her security for the loan, presents one of those immoral spectacles which elicited the animadversion of the Supreme Court of the United States in the case of *Bein* v. *Heath*, a Louisiana contract, reported in 6th How. U. S. Reports. After reviewing the Louisiana decisions, in connection with the 61st law of Toro, and with the Articles 2412 of the Louisiana Code, Mr. Justice McLean, as the organ of the court, proceeds to say : "But there is another view arising from the facts of this case, which will be now considered. It is a principle in chancery, that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who, by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity. And we suppose, that this principle applies to the case under consideration. A *feme covert*, acting on her own responsibility, under the liberal provisions of the Louisiana law, may act fraudulently, deceit-fully or inequitably, so as to deprive her of any claim for relief. This results from the capacity to make contracts, with which the law invests her. *Heath*, the agent, as has already been said, acted in good faith. He proceeded deliberately, under legal advice, and there is no ground to charge him with unfairness or collusion against *Mrs. Bein*. Assurances were made to him, in the presence of his counsel, by *Bein*, acting in behalf of his wife, that the loan was for her ; that it was *bona fide* and without any concealment. Resting

upon these and other assurances, the contract of loan was made, the mortgage was executed by *Mrs. Bein*, and the money paid to her, under the direction and sanction of his counsel. Now if these representations were false, and and *Heath* was thereby induced to part with the money, can the complainant have a standing in equity? such a proceeding would be fatal, it is supposed, under the law of Toro. For if it were admitted, that to make the law binding on the wife, it must be proved to have inured to her use; yet, if through the fraudulent intervention of the husband, she negotiated the loan, giving to it her special sanction, equity would not relieve her. A doctrine contrary to this would enable the wife to practice the grossest frauds with impunity. In the repeal of the law of Toro, and in substituting in its place Article 2412, the Legislature gave the most unequivocal evidence against the policy of that part of the repealed law which required proof to charge the wife, that the money borrowed was applied to her use. But in affirming the decree of the Circuit Court, we place our opinion upon the unconscientious acts of the wife."

The case before us is much stronger for defendant, in the equitable view of the above quotation; for in *Mrs. Bein's* case, the representations of the loan being for her use, were made by her husband in negotiations preceding the loan; whereas here, those representations are made by both the husband and the wife in the authentic act of mortgage itself, with specifications of the particular debts of the wife which the loan is to be used to discharge. Since the case of *Bein* v. *Heath*, I take it there can be no doubt that any creditor, who in the quality of alien, or of citizen of another State, would be entitled to remove a suit like the present instituted against him from the State Court into the Federal Court, would be sure of a judgment. The married woman would not be allowed, in that court, to gainsay her declarations in the act of mortgage, that the money loaned was for her own use, and if this be the jurisprudence of the Supreme Court of the United States, the very serious question arises, whether there shall be one law in Louisiana for alien creditors of married women, and another, less favorable for creditors who are citizens of the State: whether the married woman is bound by her contract with the former, while she is at liberty to repudiate her contract with the latter. Such a state of things would be as unjust towards our own citizens as it would be anomalous. I am in favor of making our doctrine conform to that of the case of *Heath* v. *Bein*. Our predecessors quoted, with approbation in the case of *Helwig* v *West*, in 2 An., the language of Ulfusia: *Decipientibus mulieribus senatus consultum auxilio non est. Infirmitas faminarum, non calliditas, auxilium meruit.*

But in the present case, besides the declarations of the act of mortgage, it has been proved by three witnesses that the following debts of *Mrs. Belouguet* were paid with the money borrowed from defendant:

1st. A note of *Mrs. Belouguet* in favor of *J. A. Durel*, secured by a prior mortgage on this property, for.................. $2,500

2d. Her bond to the Citizens' Bank for a stock loan upon the mortgaged property............................................... 3,611

3d. Taxes on the property............................................ 63

It is also found by one witness, and by checks payable to *Mrs. Belouguet* and by her endorsed, that there was paid by defendant into her own hands.................................. 3,074

Making a total, disbursed by defendant, either to *Mrs. Belouguet* personally, or for her use, of........................ $9,248

The evidence also shows, that *Mrs. Belouguet* was engaged in commercial business in her own name at the date of the mortgage, and that she made a *cessio bonorum* some eleven months after that date, and about four months before the institution of this suit. Her note for $2,500 to *Durel*, must, therefore, have been protested, to the ruin of her commercial credit, had she not obtained the loan from defendant; which thus postponed, although it did not finally prevent, her bankruptcy.

The counsel of plaintiff, in view of these facts, abandons in this court the ground of want of consideration for the notes of *Mrs. Belouguet*, secured by this mortgage; admits that defendant might have a personal action against her; but insists that the mortgage is void, as having been effected upon *dotal* property. Upon this ground, the record displays, to my mind, a deception practised by the plaintiffs, which ought to deprive them of the remedy invoked.

In the act of mortgage, immediately following the description of the property mortgaged, is this enunciation of the mortgagor's title: "*which property belongs to said Mrs. Belouguet, for having been bequeathed to her by Mrs. Marie Gabriel Eugenie Peyroux, widow by first marriage of Pierre Desislet, and by second marriage of Louis Lenoix, as will appear by an act of delivery of said property, passed before Louis T. Caire, late Notary Public in this city, on the thirtieth of December, 1836.*"

There is not the slightest intimation, either in the act of mortgage or in the act of delivery, therein referred to, that the property thus acquired by inheritance by *Mrs Belouguet* during her marriage was *dotal*. Without further explanation, the language of the act in this place would strike any lawyer as describing a paraphernal or extra-dotal estate, of which the wife has the administration, and which she may, consequently, mortgage. C. C., 2360, 2361. Other recitals in the mortgage would confirm this impression, by showing that *Mrs. Belouguet* had already granted several special mortgages upon this very same property. It is only when the first mortgage note held by defendant falls due, and the property is seized, that defendant is informed, by a document annexed to the petition in this suit, that *Mrs. Belouguet* had constituted as part of her dowry in a marriage contract made three years before her acquisition of this property: "*tous les biens qui pourront lui échoir par succession ou par donation, à l'exception des esclaves.*" The dotal character given to future acquisitions by the marriage contract was evidently material, and should have been communicated to the mortgagee. It was the duty of the mortgagor to give the mortgagee all the information requisite to a proper understanding of the security upon which he was lending his money. The concealment of this material fact in the act of mortgage is an example of the *suppressio veri*, which amounts to fraud, entirely within the definition and rules contained in Article 1841 of the Code. But can such *suppressio veri* be invoked as a means of annulling the contract by the party who has practiced the concealment? The Article 1875 answers the question. "Engagements made through error, violence, fraud or menace, are not absolutely null, but are violable *by the parties who have contracted under the influence of such error, fraud, violence or menace, or by the representations of such parties.*"

It appears to me evident, that even if we allow *Mrs. Belouguet* to take advantage of her concealment of the dotal character of the property mortgaged,

we cannot, consistently with principle, and with our own decisions, allow her to do so, without reserving in our judgment the obligation to reimburse to defendant the amount expended by him on her account, on the faith of this mortgage, as above stated. *Dearmond* v. *Courtney*, 12 An.

BELOUGUET
*v.*
LANATA.

In discharging incumbrances on *Mrs. Belouguet's* property, the defendant has acted as the special mandatary of that lady; and she is bound in law to reimburse him what he has thus expended. C. C., 2991. By the act, and with the money of defendant *Mrs. Belouguet's* property has been disencumbered. She should not be allowed to enrich herself at his expense. It is even admitted in argument, that the Citizens' Bank mortgage was valid, although the property *was* dotal. See the 25th section of the charter of the bank; Acts of 1838, 190. But it is said this cannot avail the defendant, because there has been no subrogation of the rights of the bank in favor of the defendant, either conventional or legal.

By Article 2156 of the Code, paragraph 2, there is a conventional subrogation when the debtor borrows a sum of money for the purpose of paying his debts, *and intending to subrogate the lender in the rights of the creditor.* The subsequent portion of the paragraph, which enacts that there should be a notarial receipt showing that the payment has been made with the funds furnished for that purpose by the new creditor, has, in my opinion, no application to this case; being intended as a rule of evidence in contests among creditors. As against the debtor, the enunciations of the act of loan are equivalent to the notarial receipt. It does not lie in the mouth of these plaintiffs to dispute the application of the money borrowed from defendant to the payment of antecedent mortgages.

The husband of *Mrs. Belouguet* is a party plaintiff, not only for the purpose of assisting his wife but in his own right also, claiming the revenues of the property mortgaged since its alienation at Sheriff's sale, on the ground that the husband is by law administrator of the dotal property—and claiming, for such administration, the inalienability as for the dotal property itself. This claim is, perhaps, not more inequitable than the claim of the wife; but it seems to me to have less foundation in law. Indeed, neither law nor precedent is referred to which would relieve *Mr. Belouguet* from his contract: for he was certainly a party to the contract of loan and mortgage which led to the judicial alienation of his wife's property.

I am of opinion, that the judgment should be reversed as to plaintiff *Belouguet;* and amended as to *Mrs. Belouguet*, by requiring her to reimburse to defendant the money by him paid to her and for her benefit, on the faith of the mortgage of the 4th January, 1854.

---

*C. Roselius*, for a re-hearing:

The appellant respectfully petitions for a re-hearing, and begs leave to submit the following observations in support of his application:

In the opinion delivered by the majority of the court, it is observed: "We think it sufficiently established by affirmative proof, that the portion of the money loaned, which went to pay the debt of $3,611 20, due to the Citizens' Bank, enured to her benefit." Hence, it is clear that the attitude, in which the plaintiff stands before this honorable court, is this: she alleges that she has executed a special mortgage on her dotal property, on the faith of w

BELOUGUET
v.
LANATA.

the defendant has lent her $11,533 36, and she exhibits at the same time, $3,611 20 of the money thus obtained, as still in her hands, (for that sum having been paid for her benefit, must be considered, so far as the decision of this question is concerned, in the same light as if she still retained it,) and she asks the court to rescind the contract of mortgage, but to permit her to keep the defendant's money. Is a demand so shockingly iniquitous and so outrageously unjust, sanctioned by the laws of Louisiana? Surely, before this question is finally answered in the affirmative, this honorable court will pause.

I. Your Honors say, "that the appell ant has apparent reason to complain o the hardship of the case, so far at least, as relates to that portion of the loan, which went to extinguish a valid mortgage upon *Mrs. Belouguet's* property in favor of the Citizens' Bank." I am aware that the *hardship* of a case affords no argument for disregarding the stern rules of law; and I therefore do not urge it upon the consideration of the court; but I humbly submit that the *rules of law* applicable to the subject do not give the slightest countenance to the unjust pretensions of the plaintiff; * * * * * * * * * * * *

Conceding that dotal property is not susceptible of being mortgaged, or is to be viewed as *extra commercium*, during the marriage, it does by no means follow, that the contract of mortgage can be annulled or rescinded, without compelling the plaintiff to restore the money which she has received in consequence of it, and which she either still retains or which has been employed to pay a debt she owed, and against the payment of which she had no defence. No principle of law is better settled and more universally recognized, than that, when a suit like the present is brought for the rescission of a contract, or to obtain a *restitutio in integrum*, the parties must be replaced in the same position which they occupied before the contract was made. It is true that when the ground for the rescission arises from want of capacity in one of the parties, or the absence of a thing *in commercio* to form the object of the contract, the obligation of restitution is limited to the actual benefit or advantage derived from the transaction, and has its source or origin not in the contract itself, but in the direct and immediate operation of equity and law, which will not permit one person to enrich himself at the expense of another. This is only the application of the great principle, that it is the primary and paramount province of the law to protect and vindicate legal rights—not to encourage spoliation. It is hardly necessary to refer to authorities in support of principles so elementary and fundamental. Our Code is replete with textual provisions in which the rule is enumerated in express terms. Articles 1784–5–6–7, C. C.

Art. 1784. "Besides the general incapacity, which persons of certain descriptions are under, there are others applicable only to certain contracts, either in relation to the parties, such as a husband and wife, tutor and ward, whose contracts with each other are forbidden; or in relation to the subject of the contract, such as purchases, by the administrator, of any part of the estate which is committed to his charge, and the incapacity of the wife, even with the assent of the husband, to alienate her dotal property, or to become security for his debts. These take place only in the cases especially provided by law, under different titles of this Code."

Art. 1785. "The persons who have treated with a minor, the person interdicted, or of insane mind, or with a married woman, cannot plead the nullity of the agreement, if it is sought to be enforced by the party when the disability shall cease, or by those who legally administer the rights of such person during the disability. Even a contract made with a slave may be enforced by the master if he chooses to affirm it for his benefit."

Art. 1786. "If the contract be reciprocal it must not be enforced on one side only; and if the minor, or other incapacitated person, opposes his incapacity against any part of the agreement, the whole of the contract is void."

Art. 1787. "If, in a contract with an incapacitated person, or in a contract void for want of form, entered into with any one for the benefit of such incapacitated person, any consideration be paid or given, and the contract be afterwards invalidated on account of such incapacity or want of form, the consideration so paid or given, must be restored, if it was applied to the necessary use or benefit of the incapacitated person."

Art. 2226. "When minors, persons under interdiction or married women are admitted, in these qualities, to the benefit of restitution against their engage-

ments, the reimbursement of what may have been paid in consequence of those engagements during minority, interdiction or marriage, cannot be required of them, unless it be proved that what was paid accrued to their benefit."

Art. 1312 of the Napoleon Code is literally the same as Art. 2226 of our own Code.

4 Marcadé, p. 675, No. 901.—" L'effet de la nullité ou de la rescision, prononcée par le juge, est d'anéantir l'acte qui en est l'objet, de le rendre légalement non avenu, et de remettre par conséquent les choses en l'état où elles étaient avant l'accomplissement de cet acte.

" Il suit de là, que l'annulation ou la rescision met les parties dans la nécessité de restituer tout ce qu'elles ont pu recevoir en vertu de l'acte annulé ou rescindé. Mais ce principe, qui s'applique rigoureusement aux majeurs capables, reçoit exception, d'après notre article, pour les mineurs, les interdits et les femmes mariées. Ceux-ci ne sont tenus de restituer ce qu'ils ont reçu que dans les limites dans lesquelles ils se sont enrichis ; et c'est à celui qui leur demande la restitution à prouver qu'ils ont profité de la chose." 2 Mourlon, p. 675. . 12 Duranton, Nos. 561–2.

In the case of *Tippet and Husband* v. *Jett*, 3 R. R., p. 316, the Supreme Court said :

" It is a general rule in all actions of rescission, that the party seeking relief must offer to restore his adversary to the situation he was in before the contract. He who seeks equity must do equity."

So in the case of *Walden* v. *the City Bank of New Orleans*, 2 R. R., p. 179, the Supreme Court uses the following emphatic language :

" It is quite manifest that there can be no rescission of a contract, without placing the parties in the situation they were in before the contract was entered into. It would be absurd to rescind a sale, for example, without restoring the price. This principle has been often recognized by this court, in relation to one class of actions of rescission, perhaps the most frequent in our courts, to wit: those of redhibition. The word itself implies, the replacing of the parties in the position they were in before the contract. It is now settled in this court, that such an action cannot be maintained without an offer to make restitution."

Indeed, as before stated, the rule is elementary, and is laid down in every book treating on the subject. I deem it, therefore, needless, to multiply authorities, especially as our own Code provides for the very case now before the court in Articles 1784 and 1787 ; for the judgment pronounced by the majority of the court is in direct violation of the express and imperative rules laid down in these articles. For this reason alone, I am sure, the court will not hesitate to grant a re-hearing.

II. There is another reason why the present application should be granted. In alluding to the *hardship* of the case, the court observes : "But he might have taken a subrogation to the mortgage rights of the bank, and did not. We cannot cure the effects of his *laches ;* nor can the hardship of a case, nor even the bad faith of a person laboring under a legal incapacity, have the effect to give validity to an act void in law." With all due deference and respect, I am bound to say, that this sentence contains two palpable errors. First, it is obvious that there was no necessity of taking a conventional subrogation, because, by paying the Citizens' Bank its superior mortgage claim, the defendant, who had an inferior mortgage, was *legally* subrogated to that of the bank. On this subject the Code is clear and explicit, Art. 2157, § 1 ; and, in the second place, the proposition has never before been laid down so broadly and unqualifiedly as your Honors have done, that an incapable person cannot bind himself by his bad faith. An examination of the subject, I am certain, will satisfy the court that the doctrine here enunciated is stated much too broadly. The true principle is developed by Marcadé, with his characteristic strength and clearness ; he says in his commentary on the 1307th Article of the Napoleon Code, corresponding with Article 2221 of our Code :

" Nos anciens auteurs avaient déjà fait observer que la circonstance qu'un mineur s'est tout simplement déclaré majeur, sans donner aucune preuve à l'appui de son affirmation, ne pouvait pas faire obstacle à sa restitution, attendu qu'il est bien facile à celui qui traite avec un mineur, de ne pas se contenter de cette déclaration, et qu'une telle clause, si on lui donnait l'effet d'empêcher la rescision, deviendrait de style dans toutes les conventions. Mais on a toujours

été d'accord pour reconnaître que le droit de faire rescinder s'évanouirait si le mineur, au lieu de faire seulement à cet égard une déclaration pure et simple, arrivait à tromper l'autre partie sur son âge par des manœuvres frauduleuses, par exemple, en présentant un faux acte de naissance. (Pothier, *loc cit.;* Domat, part. 1, liv. 4, tit. 6, sec. 2, No. 7.)

"La raison dit assez, et il a d'ailleurs été formellement déclaré au Corps Législatif et au Tribunat, qu'il en serait de même sous le Code." (Fenet, T. XIII, p. 289 et 373.)"

Pothier, the real author of the Napoleon as well as the Louisiana Code, holds the same doctrine:

"Par le droit romain, les mineurs qui, en contractant, avaient par mensonge persuadé à celui avec qui ils contractaient, qu'ils étaient majeurs, n'étaient pas restituables contre cet acte. *L. 2, Cod. si minor se majorem dixerit.*

"Nous ne suivons pas cette disposition de droit, parce qu'elle ouvre une voie d'éluder la restitution en entier. Ceux qui contracteraient avec des mineurs feraient insérer dans l'acte qu'ils se sont dits majeurs, et diraient toujours que le mineur les a trompés, quoique souvent ce serait plutôt un artifice pratiqué de leur part, que de celle du mineur ; c'est pourquoi, dans notre jurisprudence, on n'a point égard à la fausse énonciation de majorité pour exclure les mineurs de la restitution ; c'est à celui qui contracte avec le mineur à s'informer de son âge : *qui cum alio contrahit vel est, vel debet esse non ignarus conditionis ejus.* L. 19, ff. *de reg. jur.*

"Il en serait autrement si un mineur, pour se faire croire majeur, avait rapporté un faux acte de baptême ; il est évident que, alors, il serait indigne de la restitution, conformément à la loi 3, *cod, si minor*, etc. Procédure Civile, Part 5, Chap. 3, Art, 2.

*Legardeur*, in answer to the petition for a re-hearing :

I.   The learned counsel for the defendant says: " Conceding that dotal property is not susceptible of being mortgaged, it does by no means follow that the contract of mortgage can be annulled or rescinded, without compelling the wife to restore the money which she has received in consequence of it, and which she either still retains or which has been employed to pay a debt she owed and against the payment of which she had no defence."

If the learned counsel means simply that the holder of the annulled mortgage has a right of action and may obtain a judgment *in personam* against the wife, for the portion of the money lent, which is affirmatively shown to have enured to her benefit, I accede to his proposition. But I dissent from it, nay, proclaim it to be wholly untenable, if he means that, unless or until the wife restores that portion of the loan which has enured to her benefit, the mortgage must be held valid.

The law which prohibits the alienation of dotal property is a law of public order. *Dotium causa semper et ubique præcipua est;* NAM ET PUBLICE INTEREST DOTES MULIERIBUS CONSERVARI. Any alienation made in violation of it is an absolute nullity which can, by no means or possibility, be cured, so long as the property remains dotal. Whence it follows, as an inevitable consequence, that the court had no right, power or authority to recognize and give effect to a contract of mortgage made in violation of that law. And yet, in this case, the court is called upon to do *indirectly* what it has no power to do *directly*, that is, to declare valid, a mortgage made in violation of that law. For no sensible man will deny that the refusal to annul a mortgage, or the affirmance of it until a certain contingency has happened, which may never happen, is virtually to recognize, make valid and give effect to, that mortgage.

This view of the case, if it be correct, and I humbly trust it is, shows at once the inapplicability of the principles invoked by the learned counsel for the defendant.

They are inapplicable : 1st, because this suit is brought, *not for the rescission of the main or principal contract*, which is a contract of loan, but simply *for the annulment of the auxiliary contract*, to wit, the mortgage granted to secure the performance of the principal obligation ; 2dly, and because, even admitting the mortgage was the principal contract, and it clearly is not, still the rescission of it could neither be refused, suspended or delayed in consequence of the plaintiff's neglect, refusal or impossibility to restore the money

which has enured to her benefit, since that contract was made in violation of a law of public order, and is, therefore, absolutely null and void.

In support of this position, I respectfully beg leave to refer the court to the very able argument of Troplong (in the 4th volume of his Contrat du Mariage), on the action of the husband and that of the wife for the revocation of the SALE of dotal property not declared alienable by the marriage contract, and their respective duties, so far as the restoration of the price is concerned. He says :

No. 3532. "Le mari est responsable du prix : cette règle d'équité est absolue. Soit que l'acheteur ait connu la dotalité, soit qu'il ne l'ait pas connue, le mari, vendeur, doit restituer le prix ; car, perdre la chose et le prix serait une condition trop inique pour l'acheteur. La bonne foi veut que le mari qui a fait la vente, soit tenu du prix qu'il a reçu par suite de cette vente.

"Et ici, nous ferons une remarque importante : c'est que le mari est tenu du prix lors même qu'il n'a fait qu'intervenir au contrat pour autoriser sa femme."

No. 3533. " Ce n'est pas à dire pourtant, que l'acheteur ne devra relacher la chose qu'autant que le mari lui aura préalablement rendu le prix. La restitution de la chose dotale ne subit pas de condition. Il faut, avant tout, que le bien dotal revienne à la famille : l'acheteur fera ensuite valoir, comme il l'entendra, sur les biens personnels du mari, l'obligation de ce dernier de rendre le prix; mais la bien dotal ne doit pas être frappé d'un droit de rétention pour parvenir à cette restitution ; il est libre, inaliénable, non sujet à hypothèque ni à aucune charge réelle. Il ne répond pas des obligations personnelles du mari.

"S'il en était autrement, la révocation de l'aliénation serait illusoire. Cette révocation intéresse la famille ; elle se lie à l'ordre public, elle est placée sous la sauvegarde de la loi : des exceptions de garantie n'en doivent pas entraver la marche.

"Sans aucun doute, le mari est débiteur du prix; sans aucun doute, il doit rendre ce qu'il a reçu : mais c'est là une obligation personnelle qui peut faire l'objet d'une condamnation particulière, mais qui n'apporte pas d'obstacle au délaissement des biens."

No. 3547. "Il suit de ce que nous avons dit aux Nos. 3542 et 3544, que la femme qui agit en revendication de son bien dotal n'est pas nécessairement tenue, comme le mari, de la restitution du prix de vente. Qu'elle en est la raison ? C'est que le mari est censé avoir prix l'argent *tanquàm potentior ;* telle est la présomption constante et invariablement admise par les auteurs dotaux : *Pretium rei dotalis alienatœ,* dit Deluca, *præsumitur ad virum pervenisse.* Quand même il serait dit que le prix a été payé à elle et au mari, la présomption subsiste toujours contre le mari. N'oublions pas enfin ce que dit Justinien dans la Novelle 62, § 2, que malgré son consentement, la femme doit être indemne : " *Et si consentiat mulier, sit omninó indemnis :* Assurément elle ne serait pas indemne, si elle était obligée de payer le prix de la chose vendue."

No. 3447. "Toutefois, s'il était prouvé que la femme a profité du prix, on exigerait d'elle la restitution de ce prix : nul ne doit s'enrichir aux dépens d'autrui.

"Non pas que l'obligation de rendre le prix arrête l'action en revendication (Suprà No. 3533); mais en rendant la chose, l'acheteur conserve contre la femme une action pour se faire payer par elle de ce qui a tourné à son profit."

No. 3549. "Remarquons que c'est à l'acheteur à prouver que la femme a profité du prix ; ce qui ne se présume pas. Pour faire cette preuve, il ne suffirait pas de dire que l'argent a été versé dans le ménage, qu'il a servi à entretenir la femme, qu'il a été employé à payer ses dettes : tous ces emplois sont irréguliers ; la dot n'est pas faite pour que le capital périsse dans de telles destinations."

It is therefore plain, that the obligation under which the plaintiff in this case may be, to restore any portion of the money which, in the opinion of the court, may have enured to her benefit, does not authorize the court to refuse or delay the annulment of the mortgage. The creditor may have the right to sue her for the restoration of the money which has enured to her benefit. It may be the duty of your Honors to reserve his right of action against her. But the mortgage must be annulled. For, in the language of Troplong, " Le bien dotal ne doit pas être frappé d'un droit de rétention pour parvenir à cette restitution : il est libre, inaliénable, non sujet à hypothèque, ni à aucune charge réelle. S'il en était autrement, la révocation de l'aliénation serait illusoire ; et

BELOUGUET
v.
LANATA.

cette révocation intéresse la famille; elle se lie à l'ordre public; elle est placée sous la sauve-garde de la loi."

II.   The learned counsel next contends that there was no necessity of taking a conventional subrogation, because, by paying the Citizens' Bank its superior mortgage claim, the defendant, who had an inferior mortgage, was *legally* subrogated to that of the bank.

This proposition rests upon two assumptions: 1st., that the defendant *paid* the mortgage claim of the Citizens' Bank; 2d, that he had an inferior mortgage *when he paid the Bank*. The first of these assumptions is not supported by the evidence before the court; for *Mr. Faurès* states, in his testimony, that *he received Mr. Lanata's money when he took the plaintiff's notes to him*. Now, that the notary handed over the notes to *Mr. Faurès after* the act of mortgage had been duly executed, can hardly be contested, and, by referring to that act, your Honors will perceive that, at the time of its execution, the bank's mortgage had already been raised. The second assumption is still less tenable; for it presupposes that the two mortgages, that of the bank and that of the defendant, existed at the same time and do still exist, whilst, in point of fact, the mortgage of the Citizens' Bank no longer exists and had ceased to exist when the pretended mortgage of the defendant was executed.

But be this as it may, and assuming, for argument's sake, that the defendant *paid* the Citizens' Bank's claim, and that the two mortgages existed simultaneously and do still exist, this would by no means enable the defendant to enforce *his* mortgage, since that mortgage has been declared, and, for the purposes of the re-hearing, is conceded to be, null and void. It would at most authorize the defendant to enforce and act upon the *mortgage* to which he says he was legally subrogated, that is, the Citizens' Bank's mortgage. This he has neither done nor attempted to do. The questions, therefore, whether the bank's mortgage is still in force, and whether the defendant is legally or conventionally subrogated to it, are not before the court.

Upon the whole, we humbly believe that the judgment of this court is correct, and pray that it be maintained.

COLE, J.   The plaintiffs brought this suit for the rescission of a mortgage granted by the wife upon her dotal property, to secure the payment of eleven thousand five hundred and thirty-three dollars and thirty-six cents, and there was judgment in their favor in the court below.

Appellant in his application for a re-hearing says: "Conceding that dotal property is not susceptible of being mortgaged, or is to be viewed as *extra commercium*, during the marriage, it does by no means follow that the contract of mortgage can be annulled, or rescinded, without compelling the plaintiff to restore the money which she has received in consequence of it, and which she either still retains or which has been employed to pay a debt she owed, and against the payment of which she had no defence."

"No principle of law is better settled, and more universally recognized, than that, when a suit like the present is brought for the rescission of a contract, or to obtain a *restitutio in integram*, the parties must be replaced in the same position which they occupied before the contract was made."

The appellant cites in support of this principle, the following Articles of the Civil Code, 1784–5–6–7, 2226.

In our opinion, appellant has a right of action and may obtain a judgment *in personam* against the wife for the portion of the money lent which enured to her benefit, but he has not the right to prevent the mortgage on the dotal property being annulled, until she has paid the portion of the loan which accrued to her profit.

If such a principle was adopted, the prohibition of the alienation of dotal property, would be virtually abolished.

The law prohibits the alienation of the dotal immovables, and any alienation

in violation of it is a nullity, and no effect whatever can be given to the alienation thereof, except for the causes provided for by law.   1 Solon, Nullité des Actes, No. 135.

This position is taken by Troplong:

"Ce n'est pas à dire pourtant que l'acheteur ne devra relacher la chose qu'autant que le mari lui aura préalablement rendu le prix.   La restitution de la chose dotale ne subit pas de condition.  Il faut, avant tout, que le bien dotal revienne à la famille : l'acheteur fera ensuite valoir, comme il l'entendra, sur les biens personnels du mari, l'obligation de ce dernier de rendre le prix ; mais le bien dotal ne doit pas être frappé d'un droit de rétention pour parvenir à cette restitution : il est libre, inaliénable, non sujet à hypothèque ni à aucune charge réelle.   Il ne répond pas des obligations personnelles du mari.

"S'il en était autrement, la révocation de l'aliénation serait illusoire.   Cette révocation intéresse la famille ; elle se lie à l'ordre public ; elle est placée sous la sauvegarde de la loi ; des exceptions de garantie n'en doivent pas entraver la marche.

"Sans aucun doute, le mari est débiteur du prix ; sans aucun doute, il doit rendre ce qu'il a reçu : mais c'est là une obligation personnelle, qui peut faire l'objet d'une condamnation particulière, mais qui n'apporte pas d'obstacle au délaissement des biens.

"Toutefois, s'il était prouvé que la femme a profité du prix, on exigerait d'elle la restitution de ce prix : nul ne doit s'enrichir aux dépens d'autrui.

"Non pas que l'obligation de rendre le prix arrête l'action en revendication ; mais en rendant la chose, l'acheteur conserve contre la femme une action pour se faire payer par elle de ce qui a tourné à son profit.

"Remarquons, que c'est à l'acheteur à prouver que la femme a profité du prix ; ce qui ne se présume pas.   Pour faire cette preuve, il ne suffirait pas de dire que l'argent a été versé dans le ménage, qu'il a servi à entretenir la femme, qu'il a été employé à payer ses dettes ; tous ces emplois sont irréguliers ; la dot n'est point faite pour que le capital périsse dans de telles destinations."

Troplong, Contrat de Mariage, Nos. 3533, 3447. See also, 10 Dalloz. Recueil Alphabétique, p. 342, No. 2 ; 3 Delvincourt, p. 58, No. 9 ; Cour de Cassation, 31 janvier, 1837 ; Dal., 1837, Part. 1. p. 106 ; Toullier, par Duvergier, Tom. 14, No. 234, in notis; Cour de Cas., 4 juillet, 1849 ; Sirey, 1850, T. 1, p. 283 ; Cour de Caen, 29 mars, 1841 ; Dal., 1841, 2, 243.

This is the doctrine of Troplong and of the most celebrated authors of France.   We consider the law which prohibits the alienation of dotal property, a law of public order, and that the dotal property cannot be alienated for debts of the wife or husband, except in the cases provided by law ; further, that it cannot be retained until the price given for it is returned, but it must at once be delivered up, and the creditor must resort to his personal action for the price given for the dotal property.   And if dotal property is mortgaged, and the money obtained from the mortgage enures to the benefit of the wife, her dotal property cannot remain subject to the mortgage until the money is returned, for then there would be no inalienability in dotal property, but it could be alienated, whenever it could be shown that the money had been used for her benefit.   Such is not the object and design of the law ; it is true that the party who gets money on a mortgage given on dotal property, is under a moral and a personal legal obligation to return it.

The loss of the mortgagee is not the fault of the law, but of his own *laches;*

he could, by inquiry, have discovered his liability to loss, and have saved himself therefrom.

The laws of Louisiana have given to dotal property a particular object and character; it is settled upon the wife by marriage contract at or before the time of marriage, but it may include future effects by a special provision. Its character is fixed by the marriage contract and it cannot be settled nor even increased by a new contract during marriage. C. C. 2318-19-20.

"The dowry is given to the husband for him to enjoy the same, so long as the marriage shall last." C. C. 2327.

"The income or proceeds of the dowry belong to the husband and are intended to help him to support the charges of the matrimony, such as the maintenance of the husband and wife, that of their children, and other expenses which the husband deems proper." C. C. 2329.

The purpose of the law is to permit the creation of a fund which is to remain as long as the marriage lasts, and to serve as a resource and protection against the vicissitudes of life.

How can courts destroy the barriers that legislators in their wisdom have erected for the protection of families against the misfortunes of the world; are they to divert to foreign purposes property which was designed by the law to furnish means to nourish and educate a family, when the head of the family shall have been prostrated by misfortune?

Appellant argues that the mortgage ought to remain in its vigor, until the money given therefor, which has been used for the benefit of the wife, is returned, but this is not one of the exceptional cases mentioned in the law for which dotal property can be alienated.

"Immovables, settled as dowry, can be sold *or mortgaged* during the marriage neither by the husband nor the wife, nor by both together, except as is hereinafter expressed." C. C. 2337.

"The wife may, with the authorization of her husband, or, on his refusal, with the authorization of the Judge, give her dotal effects for the establishment of the children she may have by the former marriage; but if she be authorized only by the Judge, she is bound to reserve the enjoyment to her husband." C. C. 2338.

"She may likewise, with the authorization of her husband, give her dotal effects for the establishment of their common children." C. C. 2339.

"Immovables settled as dowry, may be alienated with the wife's consent, when the alienation of the same has been allowed by the marriage contract; but their value must be reinvested in other immovables." C. C. 2340.

"Such immovables may be likewise sold, with the authorization of the Judge, at public auction, after three advertisements, for the purpose of liberating from jail either husband or wife; of supplying the family with food in the cases provided for under the title of father and child; of paying the debts of the wife or of those who settled the dowry, when such debts are of a *certain date prior to the marriage contract;* or for the purpose of making repairs indispensably necessary for the preservation of the immovables settled as dowry; and, in fine, when the immovable is held undivided with a third person, and the same is ascertained not to be susceptible of being divided. C. C. 2341.

There is also the Act of 1855, to enable married women to contract debts

and bind their paraphernal or dotal property, but it has no bearing on the case at bar.   Session Acts, 1855, p. 254.

There is, therefore, in none of the cases provided by law, where the dotal property can be alienated, any authorization to alienate it to satisfy a just debt of the wife created subsequent to the marriage contract.

The pretended mortgage of *Lanata*, being upon dotal property, and not for a cause included in the exceptions of the law, was then a nullity, and could derive no vitality from the alleged payment of the money derived from it to the Citizens' Bank to satisfy a previous mortgage of that institution upon this property, for as the mortgage to *Lanata* was a nullity, the raising of the antecedent mortgage to the Citizens' Bank on account of said payment, could not impart existence to a mortgage having no legal being.   Nor could *Lanata* be subrogated to the mortgage of that bank, for it is not shown that his mortgage was given before that to the bank was raised; on the contrary, it appears that the mortgage to the bank was raised before *Lanata's* mortgage was given.

Neither is it shown that he paid the Citizens' Bank debt *after* he took his pretended mortgage.

Even if the pretended mortgage to *Lanata* had been created during the existence of the Citizens' Bank mortgage, and *Lanata* had paid the bank mortgage after the pretended mortgage had been given, still he was not *legally* subrogated to that of the bank, for as his pretended inferior mortgage had no existence in law, and was null, there could be no legal subrogation.

We cannot hold that the mortgage is valid, because the wife did not inform the mortgagee that it was dotal property, because such a principle would destroy the inalienability of dotal property, for in most cases where mortgages are taken on dotal property, the mortgagees are ignorant of the character of the property, for if they knew it was dotal, they would not take such mortgages. If the omission of the wife to express in the act that the property is dotal, is a sufficient ground to hold valid a mortgage on dotal property, then all the provisions of law on the inalienability of dotal property would be without effect, for bad faith would always be imputed, when a woman mortgages dotal property, for she is mortgaging that which the law prohibits being legally mortgaged.

If a mortgage on dotal property was not to be rescinded, until the parties were placed in the situation they were in before the contract was entered into, then also would all the provisions of law on the inalienability of dotal property be null and void, for the raising of the mortgage would depend on the ability of the wife to restore the money which had been paid for the mortgage.

Our laws must be interpreted as far as possible to harmonize; the Articles of the Civil Code, therefore, which are cited by appellant, so far as they refer to the case at bar, must be considered as referring to the personal obligation of the wife to restore money which has been derived from a mortgage on dotal property, and accrued to her benefit, but they cannot be interpreted as giving any vitality to a mortgage on dotal property, without destroying the effect of the articles of the law on the subject of dotal property.

The interpretation of the marriage contract and the other points in the case, have been sufficiently explained by Mr. Justice Spofford, in delivering the

former opinion of this court in this case; it is not, therefore, necessary to enlarge upon them at present.

It is, therefore, ordered, adjudged and decreed, that our former judgment remain undisturbed.

MERRICK, C. J.   As the ground upon which I formerly dissented, appears to be waived in the application for a re-hearing, I see no other sufficient reason to withhold my assent from the decree.

BUCHANAN, J.   I adhere to the dissenting opinion heretofore read by me in this case.